STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-169


PAT COOPER

VERSUS

LAFAYETTE PARISH SCHOOL BOARD



**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20145941
HONORABLE PATRICK L. MICHOT, DISTRICT JUDGE

**********

**JIMMIE C. PETERS**
**JUDGE**

**********

Court composed of Jimmie C. Peters, James T. Genovese, and John E. Conery, Judges.


**AFFIRMED.**


Conery, J., dissents and assigns reasons.


**L. Lane Roy**
**Brown Sims, P.C.**
**600 Jefferson Street, Suite 800**
**Lafayette, LA 70501**
**(337) 484-1240**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Dr. Pat Cooper**

**Shelton Dennis Blunt**
**Paul LeBlanc**
**Jack B. Stanley**
**Phelps Dunbar LLP**
**P. O. Box 4412**
**Baton Rouge, LA 70821-4412**
**(225) 346-0285**
**COUNSEL FOR DEFENDANT/APPELLEE:**
   **Lafayette Parish School Board**

**PETERS, J.**

The plaintiff, Dr. Pat Cooper, appeals a trial court judgment affirming the decision of the defendant, the Lafayette Parish School Board, removing Dr. Cooper from his position as superintendent of the Lafayette Parish School District prior to the end of his employment contract. For the following reasons, we affirm the decision of the Lafayette Parish School Board and the district court judgment affirming that decision.

## DISCUSSION OF THE RECORD

On January 1, 2012, the Lafayette Parish School Board (School Board) appointed Dr. Cooper to a three-year term as Superintendent of the Lafayette Parish School District (School District). After a two-day hearing beginning on November 5, 2014, a two-thirds majority of the School Board found merit in four of five charges asserted against Dr. Cooper and voted to terminate his employment immediately.

On November 20, 2014, Dr. Cooper appealed that decision to the Fifteenth Judicial District Court in Lafayette Parish (district court). In that appeal, he asserted that the School Board acted without cause in terminating his employment, and he sought either reinstatement or compensation for the remaining term of that contract. On the second day of a two-day hearing beginning on September 21, 2015, the district court found merit in one of the remaining four charges and affirmed the School Board's action in removing Dr. Cooper. The district court executed a judgment to that effect on October 19, 2015, and thereafter, Dr. Cooper filed this appeal.

In his one assignment of error, Dr. Cooper asserts that the trial court "misapplied the law" in sustaining the School Board's decision on the single count. The School Board answered the appeal asserting that the evidence supported a

finding that the remaining three charges not relied on by the district court had sufficient merit to support Dr. Cooper's dismissal. Additionally, the School Board sought an award of "legal costs" against Dr. Cooper.

## OPINION

The factual background concerning Dr. Cooper's actions giving rise to this litigation is not seriously disputed. The question to be decided is whether Dr. Cooper's action or actions were within his authority as superintendent of the School District; and interwoven into resolution of that question is the substantial effect 2012 La. Acts No. 1 (hereinafter referred to as Act 1) had in transferring most of the authority previously held by the elected school boards across the state to appointed superintendents. Dr. Cooper took office as superintendent before the July 1, 2012 effective date of that legislative act; and was fired over two years after the effects of the legislation were fully implemented.

While all four of the charges found to have merit by the School Board are before us by virtue of the School Board's answer, we will first address the sole charge found to have merit by the district court. We do so because an affirmance of that action on the part of the district court would render moot consideration of the other three charges.

The superintendent of a parish school system is a public officer elected by a majority of a school board's members and whose position is for a fixed period but subject to removal for cause. La.R.S. 42:1; La.Const. art. 8, § 9(B); La.R.S. 17:54. Louisiana Revised Statutes 17:54(B)(1)(b)(iii) sets forth the procedure for the removal of a superintendent as follows:

> The superintendent shall be retained during the term of a contract; however, if the superintendent is found incompetent, unworthy, or inefficient or is found to have failed to fulfill the terms and performance objectives of his contract or to comply with school

2

board policy, then the superintendent shall be removed from office as provided by Subsection C of this Section. Before the superintendent can be removed during the contract period, he shall have the right to written charges and a fair hearing before the board after reasonable written notice.

A superintendent will only be removed from his position by a vote of two-thirds of the entire membership of the school board. La.R.S. 17:54(C). Neither the compliance or lack of compliance with the required procedure nor the sufficiency of the vote of the School Board are at issue in this appeal.

Although La.R.S. 17:54(B)(1)(b)(iii) is silent on appellate procedure, La.Const art. 1, § 19 provides that "[n]o person shall be subjected to . . . forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." Thus, a superintendent, who by law has a fixed contract, has "a property interest in his continued employment and the due process rights that attach to such property interest." *Anderson v. Orleans Parish Sch. Bd.*, 340 F.Supp.2d 716, 720 (E.D. La. 2004). Accordingly, a superintendent is entitled to seek judicial review of a school board's decision to terminate his employment.

We hold, by analogy, that the proper judicial standard of review to be applied in this instance is the same as that afforded teachers pursuant to the Teacher Tenure Law as set forth in *Wise v. Bossier Parish School Board*, 02-1525 (La. 6/27/03), 851 So.2d 1090. In *Wise*, the supreme court set out the judicial review applicable to La.R.S. 17:443 of the Teacher Tenure Law to be as follows:

> In *Howell v. Winn Parish School Bd.*, 332 So.2d 822 (La.1976), we held that judicial review of tenure proceedings must be limited to an inquiry of whether the School Board complied with the statutory formalities under Louisiana's Teacher Tenure Law and whether the School Board's findings were supported by substantial evidence. " 'Substantial evidence' has been defined as 'evidence of such quality and weight that reasonable and fair-minded men in exercise of impartial judgment might reach different conclusions.' " *Coleman v.*

3

*Orleans Parish School Bd.*, 93-0916 (La.App. 4 Cir. 2/5/97), 688 So.2d 1312, 1315 (citing *Wiley v. Richland Parish Sch. Bd.*, 476 So.2d 439, 443 (La.App. 2 Cir.1985)). In conducting such an examination, the district court must give great deference to the school board's findings of fact and credibility. *Arriola v. Orleans Parish Sch. Bd.*, 01-1878 (La.2/26/02), 809 So.2d 932, 941. Reasons for dismissal are largely in the sound discretion of the school board. *Gaulden v. Lincoln Parish School Board*, 554 So.2d 152, 157 (La.App. 2 Cir.1989), *writ denied*, 559 So.2d 126 (La.1990). Thus, the school board's judgment should not be reversed in the absence of a clear showing of abuse of discretion. *Id.* Generally, an abuse of discretion results from a conclusion reached capriciously or in an arbitrary manner. See *Burst v. Bd. of Com'rs Port of New Orleans*, 93-2069 (La.10/7/94), 646 So.2d 955, *writ not considered*, 95-265 (La.3/24/95), 651 So.2d 284. The word "arbitrary" implies a disregard of evidence or of the proper weight thereof. A conclusion is "capricious" when there is no substantial evidence to support it or the conclusion is contrary to substantiated competent evidence. *Coliseum Square Association v. City of New Orleans*, 544 So.2d 351, 360 (La.1989).

The district court may not substitute its judgment for that of the school board or interfere with the school board's good faith exercise of discretion. *Howard* [*v. W. Baton Rouge Parish Sch.Bd.*, 00-3234 (La. 6/29/01)], 793 So.2d at 153; *McLaughlin v. Jefferson Parish School Board*, 560 So.2d 585 (La.App. 5 Cir.1990); *Sampson v. Lincoln Parish School Board*, 439 So.2d 454 (La.App. 2 Cir.1983). The district court's responsibility in such a case is to determine whether the school board's action was supported by substantial evidence, or conversely, constituted an arbitrary decision and thus an abuse of discretion. *Howell*, 332 So.2d at 825; *Roberts v. Rapides Parish School Board*, 617 So.2d 187, 190 (La.App. 3 Cir.), *writ denied*, 619 So.2d 1068 (La.1993). As with the district court, a court of appeal may not reverse the decision of a district court unless it finds the school board's termination proceedings failed to comply with statutory formalities and/or the school board's findings were not supported by substantial evidence. *Wiley*, 476 So.2d at 442; *Cook v. Natchitoches Parish Sch. Bd.*, 342 So.2d 702 (La.App. 3 Cir.), *writ denied*, 345 So.2d 52 (La.1977); *Mims v. West Baton Rouge Parish Sch. Bd.*, 315 So.2d 349 (La.App. 1 Cir.1975).

*Id.* at 1094-95 (footnote omitted).

The passage of Act 1 turned the relationship between school boards and their superintendents on its head. This was particularly true in the realm of hiring and firing of personnel and the fixing of salaries. Prior to July 1, 2012, La.R.S. 17:81(A) provided the following with regard to the general powers of school

4

boards and their relationship with appointed superintendents:

(1) Each city and parish school board shall determine the number of schools to be opened, the location of school houses, the number of teachers to be employed, and select teachers and all other certified personnel from recommendations made by the city or parish superintendent as required by this Subsection. The boards shall have authority to employ teachers by the month or by the year, and to fix their salaries; provided that there shall be no discrimination as to sex in the fixing thereof and provided further, that it is not the purpose of this Section to require or direct the reduction of any salary, or salary schedule, presently in force. The boards shall see that the provisions of the state school law are complied with.

(2) Each city and parish school board shall select teachers and all other certified personnel from recommendations made by the city or parish superintendent regarding the hiring and placement of all personnel for which state certification is required. It shall be the responsibility of the superintendent to ensure that all persons recommended have proper certification and are qualified for the position. Nothing shall prevent a school board from rejecting the recommendations made by the superintendent and requiring the superintendent to submit additional recommendations.

(3) Each city and parish school board shall adopt policies for and establish procedures which require a city or parish school superintendent to:

(a) Consult with the principal regarding any recommendations made by the superintendent for the hiring or placement of any teacher or other certified personnel at the school in which the principal is employed. Any recommendations made by the principal shall not be binding upon the superintendent but shall be considered by the superintendent in making his recommendations to the board.

(b) Consult with teachers regarding any recommendations made by the superintendent for the hiring or placement of a principal at the school in which such teachers are employed. Any recommendations made by teachers shall not be binding upon the superintendent but shall be considered by the superintendent in making his recommendations to the board.

(4) Any policies and procedures adopted by a city or parish school board pursuant to the provisions of this Subsection shall be in accordance with all laws, all state rules, regulations, and policies relative to certification of teachers and other personnel, and any court order or restrictions relative to desegregation.

After July 1, 2012, La.R.S. 17:81(A) provided:

(1) Each local public school board shall serve in a policymaking capacity that is in the best interests of all students enrolled in schools under the board's jurisdiction. When establishing board policies, each board shall prioritize student achievement, financial efficiency, and workforce development on a local, regional, and statewide basis. When choosing a local superintendent of schools, each board shall select a leader who shall prioritize student achievement and act in the best interests of all students enrolled in schools under the board's jurisdiction.

(2) Each local public school board shall determine the number of schools to be opened, the location of school houses, and the number of teachers and other school personnel to be employed. The local school superintendent shall have authority to employ teachers by the month or by the year, and to fix their salaries; provided that there shall be no discrimination as to sex in the fixing thereof and provided further, that it is not the purpose of this Section to require or direct the reduction of any salary, or salary schedule, presently in force. The local school superintendent shall see that the provisions of the state school law are complied with.

(3) Each local public school board shall delegate authority for the hiring and placement of all school personnel, including those for which state certification is required to the local school superintendent. It shall be the responsibility of the superintendent to ensure that all persons have proper certification, as applicable, and are qualified for the position.

(4) Each local public school board shall adopt policies for and establish procedures which require a local school superintendent to:

(a) Delegate to the principal all decisions regarding the hiring or placement of any teacher or other personnel at the school in which the principal is employed, subject to the approval of the local school superintendent.

(b) Consult with teachers prior to making any decisions regarding the hiring or placement of a principal at the school in which such teachers are employed. Any recommendations made by teachers shall not be binding upon the superintendent but shall be considered by the superintendent when making employment decisions.

(5) Any policies and procedures adopted by a local public school board pursuant to the provisions of this Subsection shall be in accordance with all laws, all state rules, regulations, and policies relative to certification of teachers and other personnel, and any court order or restrictions relative to desegregation.

(6) The superintendent and the school principal shall make all employment-related decisions based upon performance, effectiveness, and qualifications as applicable to each specific position. Effectiveness, as determined pursuant to R.S. 17:3881 through 3905, shall be used as the primary criterion for making personnel decisions; however, in no case shall seniority or tenure be used as the primary criterion when making decisions regarding the hiring, assignment, or dismissal of teachers and other school employees.

Thus, school boards evolved overnight from the hands-on operators of the schools within their school district to serving "in a policymaking capacity." However, as to the single charge the district court found to have merit in this litigation, we note that La.R.S. 17:81(U) remained unchanged by Act 1. That portion of the statute reads today as it read before July 1, 2012: "Notwithstanding the provisions of this Section, a city, parish, or other local public school board shall retain all authority given by law to such boards to prescribe the duties and fix the salaries of and hold tenure hearings for all employees of such boards, as applicable."

### *Analysis of Charge Upheld by the District Court*

The charge found to have merit by the district court was the fourth of the original five charges asserted against Dr. Cooper. That charge, as considered at the School Board hearing, asserted "Unworthiness, Inefficiency, Breach of Contract, Failure to Comply with Board Policy and State Law" on the part of Dr. Cooper, and stated the specific reasons for those assertions as follows:

> Dr. Cooper violated [School] Board policy and state law in connection with the payment of selected principals in an amount in excess of the Salary Schedule established by the School Board. In 2006 the Board adopted an indexing plan for the salaries of principals and assistant principals. This plan was subsequently incorporated into the various salary schedules approved and adopted by the [School] Board, including the salary schedule for the year 2013-14 (the "Salary Schedule"). Under this indexing plan (as incorporated in the Salary Schedule and the approved budget), elementary school principals are to be paid a salary equivalent to 203 days of work at the "daily rate of pay;" middle school principals are to be paid a salary equivalent to

7

213 days of work at the "daily rate of pay;" and high school principals are to be paid a salary equivalent to 224 days of work at the "daily rate of pay." However, Dr. Cooper, without prior School Board approval, agreed to pay five principals at a rate of 244 days of work. At its November 20, 2013 meeting the [School] Board refuse[d] to approve the administrative contracts of any employee being paid for 244 days of work, and any others in excess of policy and pay grade limits. To date, the additional payments received by these principals has not been authorized, approved, or ratified by the School Board.

This charge involves five principles hired by Dr. Cooper with full School Board approval for the 2013-2014 and 2014-2015 school years. However, what was not approved by the School Board was Dr. Cooper's unilateral decision to increase the authorized days of annual employment from either 203 or 224 days to 244 days.[1]

It is undisputed that the School Board's Salary Schedule contemplated paying principals on a daily basis based on the number of days worked in a given school year and with a maximum number of days approved for each principal level. It is also undisputed that the Salary Schedule set the maximum for high school principals at 224 days per year and the maximum for elementary school principals at 203 days per year; and that Dr. Cooper unilaterally added twenty days to the maximum for high school principals and forty-one days to the maximum for elementary school principals for the five principals he appointed to specific schools. After the School Board became aware that the Salary Schedule had not been followed in the case of these five appointments, it refused to retroactively approve the deviation from the Salary Schedule.

Dr. Cooper acknowledges that he increased the days of employment to be paid to the five principals he appointed, but denies that this action failed to comply with School Board policy because he did not increase the daily pay for the

_____

[1] The five principal positions at issue included one high school principal and four elementary school principals.

8

individual principals—he simply provided them the potential of being paid either twenty or forty-one extra days. He testified at the School Board hearing that the five principals at issue were hired by him to oversee five underperforming schools, including three that were at risk of being taken over by the State of Louisiana for academic failure. Because these schools needed exceptional, dedicated, and talented leaders, he used his many years of experience as a school administrator to seek out the individuals for these critical positions. While he readily recognized that principals in the School System were paid by the day and hired specifically for a maximum of 203, 213, or 224 days, he felt that he had the authority to expand that maximum without seeking School Board approval. According to Dr. Cooper, his authority for causing these five principals to draw more income than other principals rests in the expanded authority provided him by Act 1, and specifically La.R.S. 17:81(A)(2), which now provides the superintendent authority to employ and fix the salaries of the teachers within the school system, as well as his authority under La.R.S. 17:81(A)(6) to "make all employment-related decisions based on performance, effectiveness, and qualifications as applicable to each specific position."

We find that while a superintendent now has expanded power in the operation of school systems, that power is not absolute and is specifically limited by other provisions of Act 1. The new legislation regarding the fixing of salaries took the form of La.R.S. 17:418(A)(1) (emphasis added), which provides:

> The *governing authority* of each local public elementary and secondary school, the state special schools, and the schools and programs administered through the special school district *shall establish salary schedules* by which to determine the salaries to be paid to teachers and all other school employees. The salaries as provided therein *shall be considered as full compensation* for all work required and performed within each employee's prescribed scope of duties and responsibilities.

9

Thus, while a superintendent may fix salaries, his or her actions cannot violate the salary schedules set up as a part of the policy making obligations of a school board.

The importance of the limitation was testified to at the School Board hearing. Billy Guidry, the Executive Director and Chief Financial Officer of the School System, testified that when he discovered the deviation from the Salary Schedule created by Dr. Cooper's hiring of the five principals, he immediately concluded that such a deviation would require School Board approval. The importance of obtaining this approval, according to Mr. Guidry, was evidenced by the fact that the School System auditor had "flagged" the overpayment as a matter of concern.

Timothy Green, a Monroe, Louisiana certified public accountant and expert in Louisiana school system accounting practices and financial matters, testified that as a school auditor, any deviation from an established salary schedule is a concern to him because the schedule deviation automatically creates a budget deviation as well. In his capacity as an expert in Louisiana school system accounting practices and finance, Mr. Green testified that while a superintendent has the authority to fix teachers' salaries by determining the qualifications, experience, and other factors to be applied, the ultimate fixing of those salaries must be in accordance with the salary schedule approved by the local school board. In his expert opinion, nothing in school system legal and accounting practices allows a deviation from the salary schedule established by a school board.

As previously stated, the procedure applied in the School Board hearing process under La.R.S. 17:54(B)(1)(b)(iii) is not at issue in this appeal. Additionally, the "great deference to the school board's findings of fact" as set forth in *Wise*, 851 So.2d at 1094, does not present a question for appellate review

10

because the facts giving rise to Dr. Cooper's termination as superintendent on this charge are not disputed. The reviewing court "may not substitute its judgment for that of the school board or interfere with the school board's good faith exercise of discretion." *Id.* The remaining question is simply whether the decision on this issue at the School Board hearing is supported by "substantial evidence." *Id.* We find that it is so supported, and therefore, find no "clear showing of abuse of discretion" on the part of the School Board in removing Dr. Cooper as superintendent. *Id.*

In reaching this conclusion, we find, as obviously did the School Board, that Dr. Cooper was aware of the particulars of the School Board policy as set forth in the Salary Schedule for paying principals, he intentionally violated that policy, and he failed to call his actions to the attention of the School Board until they became an issue. While a superintendent does have expanded powers under Act 1, those powers come with the responsibility of ensuring that the use of those powers do not adversely affect other areas of importance—as in this case, the School System budget.

### *Consideration of the Remaining Charges Rejected by the District Court*

In its answer to the appeal, the School Board asks this court to review the rejection by the district court of the remaining three charges found viable at the School Board hearing. We decline to do so because, as pointed out by the School Board in its brief to this court, the supreme court held in *Wise*, 851 So.2d at 1095, that,

> [T]here is no requirement in the applicable statute or the jurisprudence that mandates all charges must be proven before termination may be imposed. To the contrary, it is sufficient to support termination if any one of the charges of willful neglect of duty against the tenured teacher is sufficiently supported by the record.

11

Applying that same rationale to litigation involving the removal of a superintendent, we find that the School Board's successful prosecution of the one charge herein requires us to go no further. To do so would be to render an advisory opinion on the remaining three issues.

### *Consideration of the Costs Issue*

In its answer to appeal, the School Board also seeks a judgment assessing the "legal costs" of the district court proceedings against Dr. Cooper. We interpret this request for relief, not in the context of a request for attorney fees, but in an effort to properly assess the cost of court associated with the district court proceedings. We reach this conclusion because we note that even though the School Board was successful in defending the School Board hearing judgment, the district court did not address the cost of court assessment in the October 19, 2015 judgment. To that extent, we assess all costs of the district court litigation to Dr. Cooper.

### DISPOSITION

For the foregoing reasons, we affirm the judgment rendered in the Lafayette Parish School Board hearing of November 6, 2014, terminating Dr. Pat Cooper as the Lafayette Parish School District Superintendent of Schools, as well as the October 19, 2015 judgment of the Fifteenth Judicial District Court affirming the November 6, 2014 judgment. We assess all costs of the proceedings in the Fifteenth Judicial District Court and all costs of the proceedings in this court to Dr. Pat Cooper.

**AFFIRMED.**

12

PAT COOPER

VERSUS

LAFAYETTE PARISH SCHOOL BOARD

**CONERY, J., dissents and assigns reasons.**

Respectfully, I dissent.

Dr. Cooper's firing by the Lafayette Parish School Board (the Board) was upheld by the trial court on the basis that he hired five principals to work in failing schools and paid them more days than the Board had authorized under its approved formula set out in its "salary schedule." (Exhibit 11) The majority affirmed the trial court's decision.

The salary schedule at issue clearly sets forth that the salaries are to be computed based on a 244 day year. For high school principals, the schedule does say that the salary is based on an 11 month schedule, or 224 days. However, there is nothing in the salary schedule that mandates that principals cannot be paid more or less than 224 days. There is no "shall" language in the salary schedule. Indeed, the legislature made it clear in Act 1 that after July 1, 2012, local school boards are to establish broad policies and superintendents are to administer the operation of the schools and make decision about all school personnel, as set forth in La.R.S. 17:81(A) (emphasis added).

> (1) Each local public school board shall serve in a policymaking capacity that is in the best interests of all students enrolled in schools under the board's jurisdiction. When establishing board policies,

**each board shall prioritize student achievement, financial efficiency, and workforce development** on a local, regional, and statewide basis. When choosing a local superintendent of schools, each board shall select a leader who shall **prioritize student achievement** and **act in the best interests of all students enrolled in schools under the board's jurisdiction.**

(2) Each local public school board shall determine the number of schools to be opened, the location of school houses, and the number of teachers and other personnel to be employed. The **local school superintendent shall have** authority to **employ teachers by the month or by the year, and to fix their salaries;** provided that there shall be no discrimination as to sex in the fixing thereof and provided further, that it is not the purpose **of this Section to require or direct the reduction of any salary, or salary schedule, presently in force.** The local **school superintendent shall see that the provisions of the state school law are complied with.**

(3) Each local public school board **shall delegate authority for the hiring and placement of all school personnel, including those for which state certification is required to the local school superintendent.** It shall be the responsibility of the superintendent to ensure that all persons have proper certification, as applicable, and are qualified for the position.

Dr. Cooper testified in the termination hearing that he followed the dictates of the statute and did what he thought was essential to "prioritize student achievement" after consulting with the then board attorney and State Department of Education.

Since one of the main purposes of Act 1 was to give the superintendent and not the school board the authority to hire and fire personnel and administer the school system for the betterment of the students, it's hard to argue against the proposition that the superintendent was doing just that when he decided to recruit highly specialized principals to try to turn around failing schools and elected to have them work twenty more days per year than ordinary principals, but at the same daily rate approved in the salary schedule, in order to try to turn those schools around.

2

Indeed, La.R.S. 17:54 mandates that in schools with performance letter grades of "C," "D," or "F," "school superintendents must state performance targets relative to student achievement." Dr. Cooper's testimony that he consulted with the academic community of the affected schools, the human resources director, the then school board attorney and the State Department of Education before making the decision to offer the principals a salary based on a full 244 day school year to be computed in accordance with the same daily rate in the salary schedule was unrebutted. The record further shows that he met with Mr. Billy Guidry, the Board's Chief Financial Officer, at some point after he hired the principals. Mr. Guidry recommended that Dr. Cooper bring this issue to the Board for their approval, even though such approval, arguably, was not technically necessary under the broad powers given to superintendents by Act 1.

The old adage that "you get what you pay for" applies here. If you want a highly qualified principal to guide a failing school in danger of being taken over by the state, it is certainly in the best interest of the students involved, as well as the school system, to hire someone willing to work 244 days at the same daily rate that everyone else is getting, just twenty work-days more than other principals. No one was receiving more money per day, no evidence of favoritism was involved, and no one is harmed by such a plan. In my view, Dr. Cooper was fired because some members of the board obviously did not approve of Act 1 expanding the powers of the superintendent at the expense of the board's traditional power over hiring and firing.

The Louisiana Supreme Court in *Louisiana Federation of Teachers v. State*, 14-691 (La. 10/15/14), 171 So.3d 835, upheld the constitutionality of Act 1. The court specifically rejected the plaintiff's constitutional challenge to the delegation

3

of administrative power to local superintendents in the above statutes:

> In addition, plaintiffs argue that La.R.S. 17:81(A)(2) and (3) which delegate the administrative authority to local superintendents, "constitutes a significant transfer of power and authority," and is therefore either a separate object or not necessary to carry out the object of improving elementary and secondary education through tenure reform and performance standards based on effectiveness. Plaintiffs argue these provisions are not necessary because the school boards could have retained their administrative authority and utilized effectiveness in making employment decisions. Again, the **legislature felt that superintendents were in a better position to make employment decisions based on effectiveness; thus, the transfer of this administrative authority was necessary to accomplish this.**

*Id.* at 849 (emphasis added).

There is additional precedent for persons working a 244 day school year in a recent case involving the Lafayette School System. Principals at charter schools in Lafayette Parish were being paid on a 244 day per year salary schedule. A panel of our court in *Aillet v. Lafayette School Board*, 14-585 (La. App. 3 Cir. 12/10/14), 154 So.3d 768, *writ denied*, 15-409 (La. 5/1/15), 169 So.3d 376, held in favor of a teacher in a charter school who had been reassigned and whose salary had been reduced based on a reduction in days worked. Our court held that the school board had to maintain her 244 day per year day schedule under the circumstances of that case. Like charter schools, failing schools require more attention and more work days. The school board had earlier recognized that by allowing charter school teachers to be paid based on a 244 day year.

In *Louisiana Federation of Teachers*, 171 So.3d at 839, the supreme court specifically mentioned that La. R.S. 17:81(A)(6):

> [I]s a new provision requiring that superintendents and principals make all employment-related decisions based upon "performance, effectiveness, and qualifications as applicable to each specific position," and requires that effectiveness "shall be used as the primary criterion for making personnel decisions" and prohibits "seniority or

4

tenure" from being used as the primary criterion. La.R.S. 17:81(P)(1) removes the requirement that personnel decisions are to approved or disapproved by school boards.

It's important to note that after the assistant district attorney representing the Board agreed with Dr. Cooper's interpretation of the statutes at issue, the Board fired the district attorney's office from representing them and hired "outside counsel" to pursue these charges against Dr. Cooper. Dr. Cooper was hired on a 5-4 vote, and he claimed that from the start of his tenure, the four dissenting board members wanted to fire him and seized upon this issue, as well as a few other relatively minor issues, to provoke a termination hearing. Dr. Cooper then filed a lawsuit against several Board members prior to the Board termination hearing seeking to recuse these board members from participating and voting at the termination hearing. Dr. Cooper claimed that the named board members were biased and prejudiced against him and could not impartially rule on the complaints. The trial judge eventually denied the recusal motion in *Pat Cooper vs. Lafayette Parish School Board, et al.,* Docket No. 2014-5116 G, Fifteenth Judicial Court, Parish of Lafayette, Louisiana.

However, a review of his well-written opinion leaves ample room for argument that this case was never about the five principals and other alleged "violations" by Dr. Cooper, but rather was about a clash of philosophy and personality. Some Board members obviously did not like Act 1 and its broadening of the school superintendent's powers and wanted to "ignore it" according to Dr. Cooper. Others felt that Dr. Cooper was arrogant, overly contentious, and somewhat dictatorial in his methods without properly respecting what had been the "traditional" role of the Board. Dr. Cooper's alleged broad and "elastic" interpretation of Act 1 coupled with his alleged attitude and demeanor served to

5

fuel the conflict.

Based on a review of the entire record, I do not believe the Board succeeded in carrying its burden of proving reasons for termination. Act 1 is remedial legislation and is to be broadly construed. The Board's decision, in my view, was based more on politics and less on law. The facts are not really in dispute. Because neither the salary schedule or anything else specifically prohibited Dr. Cooper from construing the broad powers given to him by Act 1 to offer incoming principals in failing schools a salary otherwise computed in accordance with the Board's salary schedule, but based on a 244 day work year instead of a 224 day work year, I would construe the statute broadly in accordance with the legislature's intent in implementing this remedial legislation to improve our schools. Dr. Cooper, in my view, acted in accord with that legislative policy and intent as his actions were all intended to benefit and enhance school performance. No fraud, favoritism, nepotism, or any other ill practice was shown.

The Board is responsible for the budget, and Dr. Cooper's actions without prior board approval may have had some minimal impact on the budget. Some Board members could legitimately have been offended by Dr. Cooper's actions in failing to get prior Board approval. They have a point. Indeed, it would have been prudent and, perhaps, advisable for him to do so. The Board's chief financial officer, Mr. Guidry did recommend that he get Board approval for the budgeting adjustment, but only after he had hired the principals in question. Mr. Guidry also testified Dr. Cooper was not able to bring the issue to the Board as a part of the budget process as planned, as some of the other principals apparently got wind of the fact that Dr. Cooper was paying these five principals for more days and complained to some of the Board members who had initially voted against Dr.

6

Cooper's hiring. Despite the fact that Dr. Cooper had not sought prior Board approval, after learning of Dr. Cooper's proposal, the issue came before the Board, and the Board subsequently approved the payment of the extra days for the five principals. Notwithstanding what should have been done, what Dr. Cooper did do was within his authority as school superintendent. I would find that it was an error of law to terminate Dr. Cooper based on the plain wording of La.R.S. 17:81(A).

Interpretations of law are for courts to decide. The manifest error rule providing that we give "deference" to the Board's decision under the circumstances of this case does not apply. Indeed, the trial court's earlier decision in the "recusal case," as well as the record as a whole, convinces me that those voting for Dr. Cooper's termination were not in "good faith" and were not "acting for the betterment of the students." *Wise v. Bossier Parish School Bd.*, 02-1525 (La. 6/27/03), 851 So.2d 1090, 1094. No deference is due their decision in my view. I agree with the majority that we review this case *de novo*, but respectfully disagree with the majority's conclusion.

I would likewise find that the trial court's decision to dismiss the remaining three charges against Dr. Cooper after a full trial on the merits should be affirmed for the following reasons.

### Charge Number One

"Charge No. 1" stated that Dr. Cooper refused to terminate Thad Welch, a "Special Assistant to the Superintendent," on February 6, 2013, after he was appointed by the Board on March 27, 2012, and had served in the position for almost one year. Mr. Welch was hired as a maintenance supervisor and was responsible to oversee cleaning and maintenance issues at the Lafayette Parish schools. The trial court ruled on the record in favor of Dr. Cooper, and found that

7

Act.1, which became effective on July 1, 2012, applied and that Dr. Cooper "was following the Law." Further, the trial court when questioned if any "deference" was given "to the finding of the school board on that charge," replied, "Yes, there is. That's my ruling. It was an error. They did not follow the law on that." I would affirm the trial court's ruling on this issue.

***Charge Number Two***

"Charge No. 2" stated that Dr. Cooper refused to terminate Mr. Welch. The Board had previously approved the 2012-2013 budget containing a line item authorizing the new position held by Mr. Welch. On March 20, 2013, the Board then reversed itself and eliminated the line item for Mr. Welch's position from the approved budget. This action by the Board in de-funding Mr. Welch's position would have resulted in his de-facto termination. Dr. Cooper then reallocated budgeted monies in the same cost category, the Maintenance Department, to continue to pay Mr. Welch, who remained in his position as special assistant to the superintendent.

The Board argued that Dr. Cooper should have presented an amendment to the Board for approval on the issue. Instead, Dr. Cooper "took money from some place else and paid the gentleman. That was inappropriate. For that reason, he was terminated as having violated Board Policy DCI and State law."

The trial court ruled on Charge No. 2 in favor of Dr. Cooper and stated on the record, "And the Board erred in that decision in terminating him and finding that he had violated the contract and this policy by moving that budget item, that Cooper had violated this policy and the contract."

Again, the Thad Welch issue was, according to Dr. Cooper, an excuse, albeit a flimsy one, to terminate Dr. Cooper because of a difference of philosophy about

how Act 1 should be interpreted. The Board's basis for Dr. Cooper to terminate Mr. Welch, rejected by the trial court, was that Mr. Welch did not have a high school diploma. The record showed, however, that when the applicant's for the position were interviewed and "scored," even after deducting points for Mr. Welch's lack of a diploma, he still scored higher than all of the other applicants. After a thorough review of the record, by all accounts Thad Welch was doing an outstanding job and there was no cause for terminating him. I would affirm the trial court's decision on this issue as well.

***Charge Number Three***

"Charge No. 3" was thoroughly discussed by the trial court with counsel over the two days of the hearing. Charge No. 3 involved the hiring and payment of Dr. Cooper's personal attorney. Mr. Cooper hired counsel to represent him after receiving a letter of reprimand from the Board over his hiring and then retaining Thad Welch. Charge No. 3 stated that an outside attorney was hired in "consideration of legal action challenging the reprimand of Cooper over the Welch situation." The bill was later paid at Dr. Cooper's direction and without Board approval.

The focus of the argument on Charge No. 3 was the authority granted to Dr. Cooper under the terms of his contract, under the heading "PROFESSIONAL LIABILITY," specifically, Section 9(B), which provides:

> If, in the good faith opinion of SUPERINTENDENT, conflict exists as regards the defense to such a claim between the legal position of SUPERINTENDENT AND THE LEGAL POSITION OF District, the SUPERINTENDENT may engage counsel in which event BOARD shall indemnify the SUPERINTENDENT for the costs of legal defense as permitted by state law.

The Board argued that Section 9 was an indemnity provision and did not

9

apply to a dispute between the Superintendent and the Board. Nonetheless, Section 9(C) negated the terms of Section 9(B), which only applied to a disagreement between the Superintendent and the Board in a case involving a third party. Section 9(C) provides:

> BOARD shall not, however, be required to pay any costs of any legal proceedings in the event Board and SUPERINTENDENT have adverse interests in such litigation, except as stated above.

The trial court also ruled in favor of Dr. Cooper on Charge No. 3 on the record. The trial court issued a preliminary ruling on the first day of the hearing and found that the terms of the contract, and more specifically Section (B), controlled. On this issue the trial court correctly found that:

> And so, if someone from the School Board and not Mr. Cooper drafted the contract, and Paragraph 9 (B) is clear as what it is, the (c) somewhat conflicts with (b), but any ambiguity would be resolved in favor -- or against the drafter, which would be in favor of Mr. Cooper, so therefore the legal fees would have to be paid by the Board.

When questioned by counsel for the Board if the court intended to "review the testimony and the opinions of the various lawyers that are contained in the transcript," the trial court replied, "I don't decide cases by a majority vote of what lawyers think on the issue. I look at what the standard of the law is, and the contract is very clear. I made my statements about contract law, so that's my ruling." The trial court continued and concluded, "Alright so the Board was incorrect in their interpretation of that law."

Counsel for the Board then raised the issue that there was no evidence in the record as to the drafter of the contract between Dr. Cooper and the Board. As Dr. Cooper was allowed to testify on issues not previously presented, he was available to clarify this issue. When Dr. Cooper was asked by the court if any changes were

10

made to parts (A), (B), and (C) contained in Section 9, Professional Liability, he responded "No sir." The court further stated, "That was drafted by the School Board, presented to you, and you signed it; as per that section of the contract, you made no changes or recommendations?" To which Dr. Cooper responded, "No changes." The trial court then stated, "So, he was not the drafter, and so my ruling is the same."

Counsel for the Board then requested and was granted an opportunity by the trial court to rebut the testimony of Dr. Cooper that he was not the drafter of the contract. This issue was addressed again on the next day and the Board was unable to refute the testimony of Dr. Cooper that the Board was the drafter of the contract and more specifically Section 9. The trial court then again held that Dr. Cooper was improperly terminated for submitting the bill for legal services to the Board. Based on the terms of the contract and the evidence, the trial court again ruled the contract was drafted by the Board and was to be construed against the Board. The trial court stated that the question of whether the bill "should be paid is not in front of me,"[1] and once again stated, "so my ruling remains the same on Mr. Roy's legal bill." I would affirm that ruling as well.

## CONCLUSION

I would, therefore, affirm the decision of the trial court as to Charges One, Two, and Three and reverse and remand as to Charge Four. As it is no longer possible to reinstate Dr. Cooper to his former position as superintendent, I would remand that issue to the trial court for proper assessment of damages and attorney fees.

---

[1]Pending at the time of this hearing was another suit by the Board against Dr. Cooper for reimbursement of the $5,106.21 payment to Dr. Cooper's private attorneys.

11